Joe HIX and Barbara Hix d/b/a Joe
Hix Trucking, Appellants,

v.

MINNESOTA WORKERS' COMPEN-
SATION ASSIGNED RISK
PLAN, Respondent.

No. C6-94-384.

Court of Appeals of Minnesota.

Aug. 23, 1994.

Michael A. Hatch, Kristine L. Eiden, Hatch, Eiden & Pihlstrom, Minneapolis, for appellants.

Laurel A. Graham, Oppenheimer, Wolff & Donnelly, Minneapolis, for respondent.

Considered and decided by RANDALL, P.J., and HARTEN and SCHULTZ,* JJ.

## OPINION

RANDALL, Judge.

Appellants, owners of a trucking company, brought this action for an accounting of premiums owed under an insurance policy issued by respondent Minnesota Workers' Compensation Assigned Risk Plan (MWCARP). The insurance carrier had assessed workers' compensation insurance premiums against appellants for drivers appellants leased from an out-of-state driver leasing company.

The district court granted summary judgment to MWCARP. It determined that appellants were "employers" of the leased drivers for purposes of the Workers' Compensation Act. The district court awarded judgment against appellants for the requested premiums finding that appellants and the MWCARP insurance carrier "could be liable" to pay compensation to the leased drivers under the Minnesota Workers' Compensation Act even though the driver leasing company had contractually assumed all workers' compensation liability and had obtained insurance from an Ohio-based insurance company licensed as an insurer in Minnesota. We reverse and remand.

## FACTS

Appellants Joe and Barbara Hix owned Joe Hix Trucking (Hix), a company that hauls products in Minnesota and the other 47 contiguous states. Respondent Minnesota Workers' Compensation Assigned Risk Plan (MWCARP) is a statutorily implemented workers' compensation insurance plan pursuant to Minn.Stat. § 79.251 (1992). MWCARP's function is to provide workers' compensation insurance coverage to employ-ers otherwise unable to obtain insurance in the private market. Minn.Stat. § 79.252, subds. 1, 2 (1992).

Hix owns four tractors, one of which is driven by Joe Hix. Hix leases up to three drivers from a company called Transport Leasing/Contract, Inc. (TLC), an Indiana driver leasing company. During 1992 and 1993, Hix had only one employee of its own, a secretary. Hix purchased a workers' compensation insurance policy for this secretarial employee from MWCARP's servicing carrier, Wausau Insurance Companies (Wausau), for the period June 26, 1992 through June 26, 1993. Wausau classified Hix's secretary as a "clerical" worker and charged Hix an estimated premium of $381.

Only Hix presented evidence regarding its relationship to TLC and the leased drivers. MWCARP presented evidence of its policy terms and Wausau's audit of Hix.

TLC had sole authority to recruit the drivers it leased to Hix. TLC also had sole authority to determine the assignment of a driver. It retained the sole right to discipline and/or discharge any of its driver-employees. TLC provided all training and maintained frequent contact with the drivers. It administered safety programs, maintenance programs, drug safety and road security programs for the drivers. TLC paid the drivers' wages, per diem allowance, FICA, unemployment compensation insurance and health benefits.

Undisputed evidence shows that other than advising where cargo was to be picked up and delivered, Hix had no authority to give directions to the leased drivers. Hix did not pay the TLC drivers, nor did Hix compensate TLC based on the number of hours the drivers worked. Instead, Hix paid TLC a percentage of the gross profit earned on each load.

TLC purchased workers' compensation insurance on the leased drivers from Credit General Insurance Company (Credit General), an Ohio-domiciled insurer. Credit Gen-

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by ap-pointment pursuant to Minn.Const. art. VI, § 10.

eral was licensed as an insurer in the state of Minnesota throughout the entire policy term at issue here. However, Credit General was not specifically appointed to write workers' compensation insurance in Minnesota until April 28, 1993, somewhat after the start of the policy period in question. The policy period was approximately June of 1992 until June of 1993.

The terms of the MWCARP policy provided that at the start of the policy period, Wausau would assess an estimated premium for the policy period. At the close of the policy period Wausau would audit the payroll and, if necessary, make a premium deficiency assessment if the estimated premium was too low, or refund excess premiums if the estimate was too high.

In the fall of 1993, Wausau audited Hix's records and claimed that Hix owed a deficiency premium for the leased drivers under the following policy provision:

> This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> 2. all other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of the policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.

Hix filed this action for an accounting of premiums. MWCARP responded by mailing Hix a notice of cancellation of Hix's current workers' compensation coverage. Hix sought injunctive relief to restrain cancellation of the current policy.

After negotiations, MWCARP stipulated to entry of a temporary restraining order provided that it be allowed to immediately move for summary judgment. The district court issued a restraining order and heard the parties' cross-motions for summary judgment two weeks later. The court granted summary judgment to MWCARP.

## ISSUES

1. Did the district court err in determining that appellant trucking company was an "employer" of the drivers it leased from a driver leasing company?

2. Even if appellant is an "employer" of the leased truck drivers for purposes of the Workers' Compensation Act, may Minnesota Workers' Compensation Assigned Risk Plan collect premiums from appellant where uncontroverted evidence shows that appellant and the driver leasing company agreed that the leasing company would be liable for workers' compensation benefits for the leased drivers and the leasing company obtained insurance from a company authorized to transact the business of insurance in Minnesota?

## ANALYSIS

In reviewing the grant of summary judgment to MWCARP, this court must determine whether any genuine issues of material fact existed before the district court and whether the district court erred in its application of the law. *Offerdahl v. University of Minn. Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). "A material fact is one whose resolution will affect the result or outcome of the case." *Highland Chateau, Inc. v. Minnesota Dep't of Pub. Welfare,* 356 N.W.2d 804, 808 (Minn.App.1984). This court must view the evidence in the light most favorable to the party against whom summary judgment was granted. *Grondahl v. Bulluck,* 318 N.W.2d 240, 242 (Minn.1982).

### I.

■ The district court determined that Hix had a legal obligation to obtain workers' compensation insurance for the leased drivers because Hix was an "employer" of those drivers for purposes of the Minnesota Workers' Compensation Act. We disagree.

The duty to provide workers' compensation insurance arises out of the employer-employee relationship. *See Hunter v. Crawford Door Sales,* 501 N.W.2d 623, 625 (Minn.1993) (holding that the facts demonstrated that purported independent contractor was actu-

ally an employee and remanding for calculation of benefits). The Workers' Compensation Act makes it compulsory for an "employer" to

> insure payment of compensation with some insurance carrier authorized to insure workers' compensation liability in this state, or obtain a written order from the commissioner of commerce exempting the employer from insuring liability for compensation and permitting self-insurance of the liability.

Minn.Stat. § 176.181, subd. 2 (1992).

Our analysis of the employment relationship here is guided by the supreme court's review of a grant of summary judgment to a company that, similar to here, leased truck drivers. *See Newland v. Overland Express, Inc.*, 295 N.W.2d 615 (Minn.1980). In that case, the court applied the traditional employer-employee test and the "loaned servant doctrine" in determining that Overland, a lessee of truck drivers, was not driver Newland's "employer" for purposes of the Workers' Compensation Act. *Id.* at 619. Similar to Hix, Overland leased truck drivers from another company. *Id.* at 617. Newland brought suit against Overland to recover damages for injuries he sustained while hauling a load for Overland. *Id.* at 616–17.

### A. Traditional Test.

■ *Newland* describes the following traditional five-factor test to determine whether an employer-employee relationship exists for purposes of obtaining workers' compensation benefits:

> (1) the right to control the means and manner of performance; (2) the mode of payment; (3) the furnishing of materials or tools; (4) the control of the premises where the work is done; and (5) the right of the employer to discharge.

*Id.* at 617 (citations omitted). The most important factor in determining whether a person is an employee is the right of the purported employer to control the means and manner of performance. *Id.* at 618.

In *Newland,* the supreme court determined that the evidence of control over the leased driver was not sufficient to conclude that Newland was an employee of Overland. *Newland,* 295 N.W.2d at 618. It also determined that evidence of the other factors did not show an employer-employee relationship. The court considered the following facts in making this conclusion:

> Overland had no authority to hire drivers. Its authority to fire was limited to prohibiting a driver from driving for Overland; [the driver-lessor] could continue to use the driver wherever he wanted. Overland paid no wages and provided no benefits to [leased drivers], except for a single cash bonus [the leased driver] received for safe driving. Overland had no control over which tractor and driver would be used on any trip, nor is there any evidence that Overland dictated what routes to follow or controlled details of the trips, other than those related to the freight itself.

*Id.*

Similarly, here Hix has no authority to hire drivers and its authority to fire is limited to prohibiting a specific driver from driving for Hix. In that instance, TLC would simply supply another of its own choosing. The evidence here shows less authority regarding the hiring and firing of drivers and control of the details of their work than in Overland. Overland reviewed the drivers' work records and gave the drivers a day of tests and an orientation speech. *Id.* at 617. Overland would then give the drivers that passed these requirements a copy of "Overland's Standard Operating Procedures," and required them to comply with those rules while hauling Overland's trailers. *Id.* Hix provided no training and no direction to the drivers other than advising where cargo was to be picked up and delivered. Hix did not dictate the details of the trips. Hix paid no wages or benefits to the leased drivers. Instead, it paid TLC a percentage of the gross profit on each load. TLC paid all drivers' wages and benefits.

MWCARP argues that *Newland* is distinguishable because in that case the lessor provided the tractors as well as the drivers, whereas here Hix owned the tractors and TLC only provided the drivers. While this does weigh on the side of control by Hix, this fact does not come close to turning the tide.

See *id.* at 617 (lessee of truck drivers and tractors was not employer even though it owned the trailers). If a small trucking operation like Hix has the right to hire independent contract drivers to legitimately avoid Minnesota's high workers' compensation insurance rates, the trucking company should not have to forfeit its tractors and/or trailers to be able to do this. By owning its own trucks and/or trailers, the trucking company can at least shop around for independent contract drivers. If the trucking company would have to lease the entire rig plus the driver from a leasing company, it would lose leverage in negotiations over price. On the evidence presented here, ownership of the tractors is not dispositive. The evidence does not show that Hix exercised sufficient control or otherwise acted in a manner that could support a finding that it is a true employer of the leased drivers.

To demonstrate application of the traditional rule, MWCARP cites various cases. We find them all readily distinguished because the amount of supervision and control in those cases is not present here. *See Hunter*, 501 N.W.2d at 624–25 (garage door and door opener installer was not an independent contractor where the evidence showed the employer controlled the details of this work); *Olsen v. Kling*, 363 N.W.2d 310, 312–313 (Minn.1985) (roofer was not an independent contractor where evidence showed that Kling furnished the materials used in the job, directed him where to begin working, directed him when to take breaks, directed him when to stop work for the day, directed him to work on Saturday, and had the right to discharge him); *Edelston v. Builders and Remodelers, Inc.*, 304 Minn. 550, 551, 229 N.W.2d 24, 25 (1975) (affirming Commissioner's finding of an employment relationship where builders and remodelers had the unconditional right to terminate the employee's source of sales leads).

Here, the trial court did not apply the traditional test from *Newland*, but instead used factors listed in Minn.R. 5224.0330 and 5224.0340 (1991) to determine Hix's relationship to the leased drivers. These administrative criteria were established to provide standards to distinguish between an "employ-ee" and "independent contractor" for purposes of workers' compensation coverage. Minn.R. 5224.0010 (1991); *see also* Minn. Stat. § 176.041, subd. 1(1) (1992) (Workers' Compensation Act does not apply to persons who are independent contractors as defined by administrative rules).

We consider the traditional test as applied in *Newland*, a driver leasing case, to be more appropriate. That test is less cumbersome in analyzing facts regarding multiple parties and their relationships. The traditional five-factor test in *Newland* is simpler, gives a truer picture of commercial realities, and leaves less room for error. For example, Minn.R. 5224.0330 lists thirteen criteria to consider in determining the degree of control a purported employer has over an individual and Minn.R. 5224.0340 lists eight other factors to consider in determining whether an individual is an employer or an independent contractor. Here, the trial court addressed only four of the thirteen control factors in Minn.R. 5224.0330, and then made certain impermissible findings in applying those four. It then erroneously discounted the importance of the control issue by determining it was "only one factor in determining the status of a worker" along with the remaining eight factors listed in Minn.R. 5224.0340. However, similar to the traditional test, the degree of control over means and manner of performance is the "most important factor" in the administrative guidelines. Minn.R. 5224.0330m subpt. 1; *Hunter*, 501 N.W.2d at 624.

The trial court concluded that Hix's directions to the drivers regarding where to pick up and drop off loads was the "most important instruction" to the drivers and was sufficient to show Hix's control as defined by Minn.R. 5224.0330, subp. 3. We disagree. The instruction as to the location and time for pickup and delivery of goods is a basic instruction which is necessary to the type of work the drivers were performing. According to the express terms of subpart 3, *such instructions do "not normally evince control." Id.* (Emphasis added.) Further, there was uncontroverted evidence from TLC that Hix was "not authorized to give any direction or control" to the leased driv-

ers, including maintenance, the route to be driven and "any other facet of the work."

There is insufficient evidence to support the district court's finding that Hix admitted that it "often retained the same drivers for various runs." *See* Minn.R. 5224.0330, subpt. F (continuing relationship between individual and person he or she performs services for indicates employment relationship). There is no such evidence in the record. Contrary to MWCARP's contention, Wausau's audit worksheet does not show a continuing relationship between Hix and specific drivers. That worksheet merely shows a continuous relationship between TLC and Hix. It does not list individual drivers. Hix presented undisputed testimony that the drivers received their work assignments from TLC and that TLC could reassign the drivers to a different company "at any time." This indicates Hix's lack of control under subpart 6, a factor the trial court also did not address. *See id.* at subpt. 6 (lack of control indicated if individual has a right to substitute another person without the knowledge or approval of the purported employer).

The trial court viewed the drivers' receipt of hourly wage and Hix's right to reject a driver as indicia of Hix being their employer. We disagree. *See* Minn.R. 5224.0340, subpts. 2, 4. TLC, not Hix, paid the drivers' wages and all other benefits. There is undisputed testimony that TLC had the sole right to discipline and discharge the drivers from service. It could reassign any driver that Hix rejected. This further demonstrates the difficulty in using the administrative guidelines to analyze a multiple party relationship similar to the one here.

■ Finally, contrary to MWCARP's assertion, Hix does not have the burden to prove a negative—that it is not the employer of the leased drivers. The party seeking to prove an employment relationship under the loaned servant doctrine has the burden of proof. *See Danek v. Meldrum Mfg. and Eng'g Co.*, 312 Minn. 404, 409, 252 N.W.2d 255, 259 (1977) (defendant company had burden to prove worker consented to alleged special employment relationship thus causing the exclusion remedy of the Workers' Compensation Act to apply). We find MWCARP

had the burden to prove Hix is an employer of the drivers. The trial court appeared to view any lack of evidence as a basis to infer facts to support its conclusion that Hix was an employer. In doing so, the district court made impermissible inferences against Hix. *See Home Mut. Ins. Co. v. Snyder,* 356 N.W.2d 780, 783 (Minn.App.1984) (on cross-motion for summary judgment each party benefits by a "view of the evidence most favorable to him, and with doubts and inferences in his favor").

### B. *Loaned Servant Doctrine.*

■ The trial court also analyzed this case under the loaned servant doctrine. According to that test, a worker may be the employee of a person or company who loans the worker to another for the performance of some special service and may also be the employee of the person to whom he is sent (the special employer). *Danek,* 312 Minn. at 407, 252 N.W.2d at 258. The special employer becomes liable for workers' compensation only if *all* of the following three conditions are satisfied:

(a) the employee has made a contract of hire, express or implied, with the special employer;

(b) the work being done is essentially that of the special employer; and

(c) the special employer has the right to control the details of the work.

*Id.* (quoting 1A Larson, Workmen's Compensation Law, § 48.00)/Contrary to the trial court's conclusion here, we discern no evidence to support conditions (a) and (c).

In applying the loaned servant doctrine in *Newland,* the supreme court noted that:

[C]onsent, while easily implied by submission to the employer's right to control in the independent contractor situation, is not so easily implied by submission to control in the loaned employee context, because apparent submission may be no more than continued obedience to the general employer.

*Newland,* 295 N.W.2d at 618. The court observed that the lessee of drivers in *Newland* did not have the right to control either the selection of the drivers or the manner in

which they handled the equipment. *Id.* The court concluded that there was no evidence that driver Newland consented to any control by the lessee, Overland. Similarly, there is no evidence here from which one could find that the drivers consented to the control of Hix. As in *Newland,* there is no evidence that Hix "dictated what routes to follow or controlled details of the trips, other than those related to the freight itself." *Id.* Other than the fact that Hix owned the tractors whereas the lessee in *Newland* did not, the evidence of lack of control and lack of consent is similar here. In fact, as previously noted, Hix had less contact and control over the drivers. Whereas the lessee in *Newland* tested the drivers and required that they follow the lessee's handbook of rules and procedures, the only evidence of contact and directions given here is Hix's telling the drivers where the goods to be picked up were and where to deliver them. Of necessity, someone has to tell the drivers that. It makes more sense for Hix to do so than TLC, which would not have that knowledge unless Hix picked up the phone every time and gave it to them. Hix telling leased drivers the obvious, where to pick up and deliver goods, does not make him, on that fact alone, their employer.

Cases cited by MWCARP are readily distinguished because the loaned servant's knowing and voluntary submission to the control of the special employer in those cases was apparent and because the employer controlled the details of the work. In *Danek,* the trial court granted summary judgment to the special employer because it found, as a matter of law, that the employee consented to the employment relationship with a manufacturer to whom the labor broker had sent her, and that the manufacturer controlled the details of her work. *Id.* at 408–12, 252 N.W.2d at 258–60. Danek reported to the labor broker's office and was informed of the work available that day. *Id.* at 406, 252 N.W.2d at 254. Danek was injured working as a punch press operator in the manufacturer's plant, under the manufacturer's sole supervision. *Id.; see also Nepstad v. Lambert,* 235 Minn. 1, 16, 50 N.W.2d 614, 622–23 (1951) (defendant exclusively directed all movements made by the loaned crane and loaned

operator); *St. Claire v. Minnesota Harbor Serv., Inc.,* 211 F.Supp. 521, 528 (D.Minn. 1962) (labor broker supplied a laborer to a barge company to clean the barge; laborer worked under the close supervision of the barge company).

### C. *Economic Realities Test.*

MWCARP contends that this court should apply the "economic realities" test used in Michigan to determine the existence of an employer-employee relationship in labor broker cases. This test has not been adopted in Minnesota. Unlike in Minnesota, where the control of a worker's duties is the most important factor in determining the employment relationship where one employer leases a servant to another, the economic reality test does not assign primacy to any single factor. *See Farrell v. Dearborn Mfg. Co.,* 416 Mich. 267, 330 N.W.2d 397, 400 (1982). Although the supreme court in *Danek* quoted a section of the analysis of consent and control under the economic realities test with approval, it nevertheless applied the loaned servant doctrine to determine the employment relationship. *Danek,* 312 Minn. at 412, 252 N.W.2d at 260. The context of the supreme court's citation to the economic realities test related to a finding of implied consent and implied control from circumstantial evidence in cases involving a triangular employment relationship. *Id.*

Further, *Fitzgerald v. Mobil Oil Corp.,* 827 F.Supp. 1301 (E.D.Mich.1993), is readily distinguished on its facts. In that case, the court applied the economic realities test to find that a lessee of a truck driver was the driver's employer. *Id.* at 1303. The truck driver submitted to a road test administered by Mobil Oil (the lessee) before he was hired to deliver oil. *Id.* at 1302. Here, there is no evidence that the drivers submitted to testing or prior approval of Hix. Under the lease agreement in *Fitzgerald,* Mobil reimbursed the lessor for all of the driver's wages and other expenses, including workers' compensation and insurance premiums. *Id.* at 1303. The lease agreement here was considerably different. Hix did not compensate TLC for benefits paid nor did it compensate TLC based on the number of hours the driv-

ers worked. Rather, Hix paid TLC a percentage of the gross profit earned on each load.

Unlike in *Fitzgerald,* here the evidence shows that Hix did not have the right to supervise or control the drivers other than to direct them where to pick up and deliver a load. The undisputed testimony here is that TLC, not Hix, had "sole authority to determine the assignment of a driver" and could reassign a driver "at any time." Hix could not require TLC to hire a particular driver. Unlike the drivers in *Fitzgerald,* there is no evidence that the leased drivers here had daily contact with Hix or that any driver worked exclusively for Hix or had a long-term relationship with Hix.

## II.

■ MWCARP argues that public policy and the facts here compel a finding that Hix must pay workers' compensation premiums because TLC did not obtain insurance through an insurance company licensed to write workers' compensation insurance in Minnesota. We disagree. TLC contractually assumed the responsibility to provide workers' compensation insurance for the leased drivers and obtained said insurance, MWCARP cannot charge Hix premiums for the leased drivers. There has never been an issue about coverage, there has never been a claimed denial, and Credit General would have no defense to a claim of workers' compensation that, although it had insurance in force, its "appointment" was during the policy and not before. Credit General would be collaterally estopped from such a defense as they were late, not the State of Minnesota.

■ Under Minn.Stat. § 176.071 (1992), two parties may agree between themselves as to which entity would be responsible for the provision of workers' compensation benefits. *Bilotta v. Labor Pool of St. Paul, Inc.,* 321 N.W.2d 888, 890 (Minn.1982). Minn.Stat. § 176.071 provides, in part:

When compensation is payable under this chapter for the injury or death of an employee employed and paid jointly by two or more employers at the time of the injury or death these employers shall contribute to the payment of the compensation in the proportion of their wage liabilities to the employee. * * * As between themselves such employers may arrange for a different distribution of payment of the compensation for which they are liable.

An agreement between a lessor and lessee of drivers to allocate responsibility for workers' compensation is consistent with the provisions of the Workers' Compensation Act, even if such an agreement permits one party to operate without insurance. *See Rackow v. Kujak Transport,* No. 475–56–8817, 1991 W.L. 19256, at *4 (Minn.Work.Comp.Ct.App. Jan. 8, 1991), *affirmed by Rackow v. Kujak Transport,* 468 N.W.2d 337 (Minn.1991).

In *Rackow,* a trucking company headquartered in Minnesota leased drivers from an out-of-state driver leasing company which agreed to provide workers' compensation for the leased drivers. *Id.* at *2. Similar to *Rackow,* Hix and TLC agreed that TLC would be responsible for workers' compensation benefits. The Workers' Compensation Act permits such an agreement even if it enables Hix to operate without workers' compensation insurance for the drivers it leases from TLC. *Id.* at *4 (lease agreement was not fraudulent scheme because Minn.Stat. § 176.071 permits joint employers to contractually distribute the payment of workers' compensation between themselves even if the agreement places the entire liability upon an out-of-state employer, thus enabling the Minnesota employer to operate without workers' compensation insurance). The supreme court affirmed this decision without an opinion. *Rackow,* 468 N.W.2d at 337.

■ MWCARP argues that while Minn. Stat. § 176.071 allows two employers to arrange between themselves for their liability for distribution of benefits to injured employees, those employers are each still obligated to insure that workers' compensation insurance is obtained from an "insurance carrier authorized to insure workers' compensation liability in this state." *See* Minn.Stat. § 176.-181, subd. 2(1). We disagree. Application of these statutory provisions presents a question of law which this court reviews de novo, giving no deference to the lower court's deci-

sion. *Karst v. F.C. Hayer Co.*, 447 N.W.2d 180, 181 (Minn.1989).

MWCARP contends that *RNW Assocs. v. Minnesota Workers' Compensation Assigned Risk Plan*, 764 F.Supp. 562, 564 (D.Minn. 1991) considered the application of sections 176.071 and 176.181 and rejected the argument proposed here by Hix. MWCARP is mistaken. *RNW* is distinguished in its analysis of the law and on its facts. First, the *RNW* court did not mention Minn.Stat. § 176.071 or that section's relationship to section 176.181. *Id.*

*RNW* involved a Wisconsin corporation that leased drivers to Minnesota trucking firms. *Id.* at 563. Similar to here, MWCARP provided workers' compensation insurance to many of RNW's clients for their own employees, but not for the drivers these clients leased from RNW. *Id.* at 563–64. Unlike here, the court in *RNW* determined that MWCARP's clients were employers of the drivers they leased. *Id.* at 563. A further important distinction is that RNW purported to provide workers' compensation insurance for the leased drivers through an entity *that was not an insurance company* and that was at no time licensed to do business in Minnesota. *Id.* at 565. The court held that MWCARP had the right to assess premiums to its policyholders for truck drivers they leased from RNW where those drivers were not otherwise insured by "an insurer licensed in Minnesota." *Id.*

Here, TLC provided workers' compensation insurance coverage for the leased drivers through Credit General. Unlike the insurer in *RNW*, Credit General is a "real" insurance company which was duly authorized to transact the business of insurance in Minnesota throughout the entire policy term at issue here. Further, although Credit General was not specifically appointed in workers' compensation at the beginning of the policy term at issue here, it did become so appointed during the policy term.

MWCARP argues that since Credit General's appointment to write workers' compensation insurance did not come until April of 1993, it violated Minn.Stat. § 176.181 and MWCARP could therefore back date its premiums to June 1992. We disagree. Credit

General was licensed to write insurance in Minnesota during the entire time in question. While it may have written the workers' compensation policy prematurely, the policy was in effect, was collectible on the insured drivers, and Credit General would have no defense to a claim that it had not gotten its "appointment" to write workers' compensation insurance until April 28, 1993. MWCARP concedes that there were no unpaid claims between the beginning of its policy and April 28, 1993 when Credit General was appointed in workers' compensation. This issue did not come to MWCARP's attention by way of any complaint from an injured party. It came from a routine audit because Hix wanted MWCARP coverage for one secretary.

Hix argues, and we agree, that MWCARP has no exposure here. The Minnesota Department of Commerce has full regulatory authority over Credit General at all material times. The Department of Commerce had authority to examine Credit General, *see* Minn.Stat. § 60A.031 (1992), to undertake investigations of the insurer, *see* Minn.Stat. § 45.027, subd. 1 (1992), to order it to pay fines, *see* Minn.Stat. §§ 72A.23, 45.027, subd. 6, 60A.031, subd. 6, to issue an order to show cause or a cease and desist order, *see* Minn. Stat. § 45.027, subd. 5, to order the insurer to replenish any deficiency the insurer had in the amount of paid-up capital and surplus required by law, *see* Minn.Stat. § 60A.07, subd. 5(e) (1992), to suspend or revoke its license, *see* Minn.Stat. § 45.027, or even to seize the insurer's assets to protect the interests of policyholders, creditors or the public, *see* Minn.Stat. §§ 60B.12, 60B.13 (1992). The Commissioner's authority to assess capital and surplus requirements for the insurer extends to "all types of insurance transacted by the insurer, whether or not only a portion of the types of insurance are transacted in this state." Minn.Stat. § 60A.07, subd. 5(f). If Credit General violated a statute or rule by selling a workers' compensation policy prematurely, the Commissioner would have the power to take supervisory action against it. *See* Minn.Stat. §§ 72A.02 (criminal sanctions, fines, and suspension of authority to do insurance business); 45.027 (providing for le-

gal actions and sanctions). Thus, MWCARP has no exposure. Allowing MWCARP to assess premiums to Hix for the leased drivers would result in duplicate workers' compensation coverage and in MWCARP receiving a windfall of premiums where it has no risk of paid claims for the drivers leased by Hix and insured by Credit General.

▪ MWCARP makes a battery of brief "public policy" arguments and requests a "bright line" test whereby if an insured of MWCARP leases drivers, the insured would automatically be deemed an employer and be required to pay premiums to MWCARP unless it could prove that alternate coverage had been obtained through an insurer specifically authorized to write workers' compensation insurance in Minnesota. Hix presented evidence that in 1991, MWCARP filed an amendment to its workers' compensation policy with the Minnesota Department of Commerce and sought to adopt a similar "bright line" standard. The proposed amendment was not adopted. The legislature and the Department of Commerce are the proper arenas for MWCARP's policy arguments if they feel aggrieved.

The public policy of providing workers' compensation insurance to cover leased drivers was properly taken care of by TLC, Credit General and Hix.

▪ Interpretation of an insurance policy is a question of law which this court reviews de novo. *Garrick v. Northland Ins. Co.*, 469 N.W.2d 709, 711 (Minn.1991). The MWCARP insurance policy permits the insurer to assess premiums against Hix based on payroll for "all other persons engaged in work that *could make us liable* under Part 1 (workers' compensation insurance)." Because we conclude that MWCARP has no risk of liability to pay benefits here, the terms of its insurance policy do not allow for an assessment of premiums against Hix. *See Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 36 (Minn.1979) (any

reasonable doubt as to the meaning of an insurance policy must be resolved in favor of the insured).

▪ In addition to the error in assessing premiums for the leased drivers, Hix claims that the trial court erred in awarding MWCARP its entire request for premiums which also included premiums for Barbara and Joe Hix. The Workers' Compensation Act does not apply to sole proprietors or their spouses. Minn.Stat. § 176.041(1)(d). MWCARP argues that Barbara and Joe Hix elected to be covered under the policy for a period of 39 weeks and that this election, authorized pursuant to Minn.Stat. § 176.041, subd. 1a, rebuts any statutory presumption that the Workers' Compensation Act does not apply to them. However, evidence presented by Hix and also evidence presented by MWCARP indicates a material disputed issue of fact here.[1]

Barbara Hix testified by affidavit that Hix purchased workers' compensation insurance from MWCARP for only one employee, Hix's secretary. She also testified that Hix paid all premiums on the policy. The first affidavit of David Ernisse on behalf of MWCARP states that as a result of the audit performed after the policy period, Wausau mailed Hix a deficiency premium of $4693.12 "for workers leased from TLC." The only evidence which contradicts the testimony that Hix only sought insurance for its secretary is a statement in Ernisse's supplemental affidavit served two days before the summary judgment hearing. In that affidavit, Ernisse refers to an audit summary dated and apparently prepared three days prior to the summary judgment hearing. A notation on that summary purportedly evidenced that Barbara and Joe Hix were endorsed on the policy for 39 weeks each. Ernisse then explained that the deficiency premiums included premiums for the Hixes. The date of this summary indicates that it may have been prepared for this litigation. The trial court made no mention of the premiums for the

---

1. MWCARP contends that Hix should be barred from raising an objection regarding the assessment of premiums for Joe and Barbara Hix claiming this issue was raised for the first time on appeal. Our review of the record, however, indicates that Hix did present evidence which rebuts MWCARP's claims for these benefits.

Further, MWCARP's submission of its audit summary just two days before the hearing created the problem. Under these conditions, we will review this issue. *See* Minn.R.Civ.App.P. 103.04 (court of appeals "may review any other matter as the interest of justice may require").

Hixes and only concluded that the premiums for the leased drivers were properly charged against Hix. On this evidence, viewed in the light most favorable to Hix, there is a material disputed fact regarding the premiums charged for its proprietors.

## DECISION

There is insufficient evidence to support a conclusion that Hix is an "employer" of the leased drivers under either the traditional test or the "loaned servant doctrine." Thus, Hix is not required to obtain separate workers' compensation insurance for the leased drivers. His obligation to do so was properly contracted out to TLC. The contractual allocation to TLC of liability for workers' compensation benefits, and TLC's contracting for workers' compensation insurance with an insurer licensed to do business of insurance in Minnesota complies with requirements of the Workers' Compensation Act to provide insurance for the leased drivers. We reverse the award of premiums to MWCARP for the leased drivers. We remand the issue of premiums assessed for Hix's two proprietors to the trial court to consider the dispute concerning whether they voluntarily elected coverage.

**Reversed and remanded.**