*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2282**

Robert R Elliott, individually, and as trustee of the
Robert R. Elliott Revocable Trust
and the Elliott Mandelheim Trust,
Appellant,

vs.

Noah's Ark Processors, LLC, et al.,
Respondents,

Tal Parente, et al.,
Respondents,

Dawson Partners, LLC, et al.,
Defendants.

**Filed August 18, 2014
Affirmed in part, reversed in part, and remanded
Hudson, Judge**

Lac Qui Parle County District Court
File No. 37-CV-11-200

Kevin K. Stroup, Stoneberg, Giles & Stroup, P.A., Marshall, Minnesota (for appellant)

William M. Topka, Robert B. Bauer, Dougherty, Molenda, Solfest, Hills & Bauer, P.A., Apple Valley, Minnesota (for respondents Noah's Ark and Total Corporate Resources II, LLC)

Richard G. Stulz, Swenson, Nelson & Stulz, PLLC, Madison, Minnesota (for respondents Parente, et al.)

Considered and decided by Halbrooks, Presiding Judge; Hudson, Judge; and Reilly, Judge.

**HUDSON**, Judge

Appellant investor argues that the district court erred by granting judgment as a matter of law (JMOL) dismissing his claims based on the breach of two agreements governing his investment in a facility operated by respondent companies. We affirm the district court's JMOL on breach of the 2009 agreement because appellant did not sufficiently prove losses resulting from one respondent's failure to adequately maintain his capital accounts. But we reverse JMOL on breach of the 2008 agreement because a legally sufficient basis exists to sustain the jury's verdict that the breach directly caused damages, based on the difference between the value of the companies as represented and their actual value when the investment was made.

## FACTS

Appellant Robert Elliott, acting individually and as a trustee, challenges the district court's grant of JMOL dismissing his contract claims relating to his investment in a kosher meat-processing facility in Dawson, Minnesota, which is operated by respondents Noah's Ark Processors, LLC, and Noah's Ark Holding Company, LLC (the companies). During the relevant time periods, the companies were owned by respondent Parente Family Limited Partnership, which in turn was owned by respondents Ilan and Tal Parente, who are brothers.

Elliott, a retired attorney who also has experience in investing and raising cattle, first met the Parente brothers in 2007 when he sold them livestock for processing at another facility in South Dakota. After they discussed his potential investment in the new

Minnesota facility, Elliott lent $300,000 to that business in 2007 and $250,000 more in early 2008. Elliott testified that he "saw that [the companies] had problems with the books" and told the Parentes that they would need to improve recordkeeping to obtain additional financing from their bank, KleinBank. He then met with bank representatives and made a third loan of $20,000. He testified, however, that he believed that "a lot of the risks at the end of 2007 had been removed by [the facility] going operational."

On August 1, 2008, Elliott, Ilan and Tal Parente, the companies, and the Parente Family Limited Partnership entered a written agreement (2008 agreement). Under that agreement, Elliott's previous loans were converted to an equity investment; he invested another $430,000, for a total of $1,000,000; and in exchange, he received a 10% ownership share in the companies. The agreement also provided that, if 2009 operating income showed a shortfall from projections, Elliott's ownership percentage would be increased. It stated that Elliott would be kept informed weekly of the cash position of the business and how it was progressing.

The 2008 agreement further provided:

> Seller and Principal Representations and Warranties. Seller and Principal represent and warrant to Buyer as follows:
>
> (i)    The assets and liabilities stated in the Balance Sheet of each of the Companies, appended hereto as EXHIBIT B, are not materially incorrect as of the date of this Agreement.
>
> . . . .
>
> (iv)    There are no material problems with any aspect of the business of the Companies that have not been disclosed to Elliott.

A profit-and-loss statement attached as an exhibit represented that the companies had net income in 2007 of $624,182, including the Minnesota investments, and projected net income of approximately $1,085,000 for 2008.

In September 2008, Elliott received another profit-and-loss statement, which showed net income of $496,707 for the period from March-August 2008. Although KleinBank received that statement, the bank required more information to show that the books were reconciled and ultimately declined to provide additional financing. Elliott testified that in September, he still understood that the companies were profitable, and the Parentes informed him that "on a current basis they were making money." In November, however, Elliott visited the facility, matched shipping lists of animals that had come in with product shipped and payments, calculated other expenses, and realized that the companies were incurring substantial losses. He later obtained a profit-and-loss statement that showed a loss of $498,000 from January–May 2008. Another profit-and-loss statement, which was used for tax purposes, showed a loss of $1,353,000 for all of 2008.

In January 2009, respondent Steven Krausman and his organization, respondent Total Corporate Resources II, LLC (TCR), took an equity position in the companies and attempted a turnaround. Elliott agreed to reduce his equity position from 10% to 4.5% in the restructuring. Krausman's group then owned 76% of the company and agreed to pay all amounts owing to creditors.

As part of the restructuring, new agreements were signed, including the Second Amended Operating Agreement (2009 agreement). That agreement provided, inter alia,

4

that capital accounts would be maintained; that net profits and losses would be allocated to members pro rata to conform to their respective interests; that the manager had a duty of good faith; and that, in the event of dissolution, members would be paid in proportion to their capital accounts.

In 2010, after the companies continued to incur severe losses, Elliott filed a complaint asserting several claims against various of the respondents. The district court granted partial summary judgment in favor of respondents. The district court then held a jury trial on Elliott's remaining claims against the companies for common-law fraud, securities fraud, and breach of the 2008 agreement, and his claim against TCR for breach of the 2009 agreement. The district court also requested an advisory opinion from the jury on Elliott's claims against the Parentes and Krausman for breaches of fiduciary duty.

At trial, Elliott testified that, based on his current knowledge as an owner of the companies, he believed that in August 2008, his interest had been worth only $50,000, or 5% of his investment, and that he had relied on the Parentes' representation of the companies' financial condition in making his investment. Elliott's expert accountant testified that as of August 1, 2008, he valued Elliott's 10% interest at $50,000-$100,000, and that as of January 1, 2009, he valued that interest at $310,000.

Elliott testified that, after the restructuring, he had no detailed involvement with the companies. He testified that he did not receive tax information for filing his 2008 and 2009 returns until about two years later, and he never received a statement allocating him 4.5% of the companies' losses or an accurate statement of his capital account.

Krausman testified that he performed minimal due diligence when he purchased the companies, and he delegated tax preparation matters to his accountant. He indicated that he was aware that no tax losses had been allocated to Elliott for 2009-2012, but that his accountant lacked a copy of the 2008 agreement showing Elliott's $1,000,000 investment in the companies. When Elliott's counsel asked him to estimate how much money TCR "has loaned," he replied that the companies had been funded with about $55,000,000, which had not been repaid.

Respondents' expert accountant testified that Elliott's capital account for 2008 netted out to approximately $443,000, but he could not tell if real distributions had been made. He stated that TCR's contribution was stated as capital on the companies' 2009 return, and that if other testimony indicated that the funds were loans, the capital account would have been incorrectly reported, and the loan debt would have been a first lien, to be paid before equity owners' interests. But he testified that even if Elliott had been correctly allocated capital losses, assuming that Elliott was a passive investor, he would have been allowed to deduct those losses only to the extent that he reported passive income. The accountant testified that he could not tell whether Elliott would have been entitled to report those losses without obtaining information on his financial situation, which was not part of the record.

The jury rejected Elliott's claim for fraud, finding that even though false representations were made, his reliance on those representations was not reasonable. The jury also denied recovery on the Minnesota Securities Act claim, finding that although untrue statements were made, Elliott knew of their untruth. The jury found, however,

6

that the companies had breached the 2008 agreement and that the breach directly caused Elliott damages of $126,740. The jury also found that TCR breached the 2009 agreement, which directly caused Elliott damages of $550,000. Finally, the jury found that a basis existed for a breach-of-fiduciary-duty claim against the Parentes, but not against Krausman.

Respondents moved for JMOL, and the district court granted the motion, concluding that the evidence failed to support Elliott's claims for contract damages as a matter of law. The district court stated that, with respect to breach of the 2008 agreement, although Elliott claimed to have suffered damages arising from misstatements of the companies' value and failure to bring the books current, the jury had rejected the fraud claim, and Elliott failed to show how any breach caused him damages. With respect to breach of the 2009 agreement, the district court stated that Elliott failed to provide evidence by which the jury could have calculated a loss resulting from a misstatement of his capital account or the failure to properly allocate tax losses. The district court retained jurisdiction over an equitable remedy requiring Krausman to make an accurate accounting of Elliott's capital accounts and adjust loss allocations in those accounts, consistent with the terms of the operating agreements. This appeal follows.

## DECISION

Elliott argues that the district court erred by granting JMOL on his contract claims based on breach of the 2008 and 2009 agreements. "JMOL is appropriate when a jury verdict has no reasonable support in fact or is contrary to law." *Longbehn v. Schoenrock*, 727 N.W.2d 153, 159 (Minn. App. 2007); *see* Minn. R. Civ. P. 50.01 (providing that the

7

district court may grant judgment as a matter of law if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue"). Courts "view the evidence in the light most favorable to the nonmoving party and determine whether the verdict is manifestly against the entire evidence or whether despite the jury's findings of fact the moving party is entitled to judgment as a matter of law." *Longbehn*, 727 N.W.2d at 159 (quotation omitted). The jury's verdict may not be set aside unless no reasonable theory of the evidence sustains it. *Id*. A district court's grant of JMOL presents a question of law, which we review de novo. *Id*.

*2008 agreement*

The parties do not dispute the jury's verdict that respondent companies breached the 2008 agreement, which represented that information on assets and liabilities appended to the agreement was not materially incorrect and that the companies had no undisclosed material problems. It is also undisputed that an exhibit appended to the agreement contained materially incorrect information on the companies' financial status, asserting that they were profitable when, in fact, they were incurring significant losses.

Respondents, however, argue that the district court did not err by granting JMOL because Elliott failed to prove that his investment losses resulted from the breach. In its order, the district court stated that although "[t]here was significant testimony at trial concerning misrepresentations made by Parentes leading up to the signing of the August 1, 2008 agreement . . . the jury rejected the fraud claim." Respondents essentially argue that the jury's verdict awarding Elliott damages for breach of contract was

8

inconsistent with its rejection of his fraud claim on the basis that he did not reasonably rely on misrepresentations leading up to the 2008 agreement.

But this court "will not disturb a jury's answer to special verdict questions if it can be reconciled on any theory, and will set aside a special verdict answer only if it is perverse and palpably contrary to the evidence." *George v. Estate of Baker*, 724 N.W.2d 1, 6 (Minn. 2006) (quotation omitted). Here, Elliott asserted his contract claim based on provisions in the 2008 agreement itself, which "represent[ed] and warrant[ed]" that the financial information submitted by the companies was not materially incorrect and that no material problems remained undisclosed. *See, e.g., Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 531 (Minn. 1986) (addressing breach-of-warranty claim based on seller's alleged failure to include certain account payable items in business balance sheet).

We recognize that the Minnesota Supreme Court has not definitively resolved the issue of whether proof of reasonable reliance is required in a breach-of-warranty action. *See Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 544 n.6 (Minn. July 2, 2014) (holding that a claim based on breach of contractual representation of future legal compliance is actionable without proof of reliance, but noting that "it is not necessary . . . to resolve th[e] disagreement" on whether reliance is an element of a claim for breach of express warranty). Nonetheless, in this case, the jury was instructed on reliance only as an element of Elliott's fraud claim, not as an element of his contract claim. On the contract claim, the jury was asked to answer special verdict questions only

as to whether a breach occurred, whether the breach directly caused damages to Elliott, and the amount of those damages. Respondents have not challenged those instructions.

"[C]ausation in a breach-of-warranty case presents a factual issue." *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 816 (Minn. App. 2010), *review denied* (Minn. Sept. 29, 2010). We must uphold the jury verdict if it "can be sustained on any reasonable theory of the evidence." *Longbehn*, 727 N.W.2d at 159 (quotation omitted). Based on this record, the jury could reasonably have found that the misrepresentations of the companies' financial status in the 2008 agreement and the failure to disclose their significant losses caused Elliott to sustain damages by investing in a business that was worth far less than its claimed value.

One measure of damages for breach of warranty is "the difference between the actual value of the property and its value if it had been as represented." *Wallace v. Hallowell*, 56 Minn. 501, 507, 58 N.W. 292, 294 (1894). Here, Elliott's expert testified that the actual value of Elliott's ownership in the companies was between $50,000 and $100,000 at the time of the 2008 agreement and approximately $310,000 in 2009. Based on evidence of the difference between the value of the companies as represented and their actual value, the jury's award of $126,741 is not excessive, and we reverse the district court's grant of JMOL on Elliott's contract claim arising from the 2008 agreement and remand for the district court to issue judgment based on the jury's verdict on that claim.[1]

_____

[1]Because we conclude that the jury's damages award may be sustained based on misstatements of the value of the companies, we need not consider Elliott's additional argument that he suffered damages resulting from a loss of the banking relationship with

*2009 agreement*

Elliott also argues that the district court erred by granting JMOL on his claim for TCR's breach of the 2009 agreement, which represented that accurate statements of capital accounts would be provided. The jury found a breach of that agreement resulting in damages of $550,000. Elliott's claimed losses resulting from that breach are akin to lost profits. *See Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 266 (Minn. 1980) (addressing issue of lost-profit damages). A plaintiff has the burden to establish the existence of lost-profit damages to a reasonable certainty and the amount of damages to a reasonable probability. *Hydra-Mac*, *Inc. v. Onan Corp.*, 450 N.W.2d 913, 920 (Minn. 1990). "[S]peculative, remote, or conjectural" damages are not recoverable. *Cardinal Consulting Co.*, 297 N.W.2d at 267. But if the fact of loss has been shown, a difficulty in proving the amount of damages does not preclude recovery if a reasonable basis exists to approximate that amount. *Leoni v. Bemis Co., Inc.*, 255 N.W.2d 824, 826 (Minn. 1977).

Elliott maintains that he sustained damages because his capital account was misstated as $443,000, rather than $800,000, and because he was allocated no tax losses, which would have been deductible on his personal tax return. But as the district court noted, Elliott furnished no evidence to show that a breach of the 2009 agreement resulted in any actual damages to him. He introduced his K-1 tax form only for the year 2008, before the 2009 agreement was signed. And respondents' accountant testified that,

---

KleinBank, the companies' failure to attract new investors, or the dilution of his equity interest in the companies when TCR undertook the restructuring.

11

assuming that Elliott was a passive investor, he could have deducted passive losses only to the extent that he received passive income. Because Elliott did not submit evidence of his personal tax returns or that he was not a passive investor, the record contains an insufficient basis for the jury to have found that he sustained actual damages resulting from the misstatement of capital accounts or the incorrect allocation of losses. *Cf. id.* (distinguishing between establishing the fact of a loss and establishing the amount of that loss).

Elliott highlights a discrepancy between Krausman's testimony that loans to the companies were not paid back and respondents' accountant's testimony that the investments were booked as equity. Elliott maintains that, if the investments were booked as loans, the companies would be in first lending position during a sale or liquidation, but if they were booked as equity, investors would retain priority based on their capital accounts. But his argument that a misstatement of capital accounts would affect any distribution of profits or the order of payment on sale or liquidation is speculative and not relevant here because no evidence showed that the companies had earned any profits or were subject to sale or liquidation. Therefore, we conclude that the district court did not err by granting JMOL on Elliott's claim based on breach of the 2009 agreement because he failed to prove actual damages resulting from that breach.[2]

Finally, Elliott argues that, because respondents did not move for remittitur, if the district court determined that even minimal damages had been proved, it was required to

---

[2] We note that the district court has given Elliott an equitable right of recovery based on an accurate accounting of the companies' operating losses for the years in question.

12

uphold all of the special verdicts. We reject this assertion. The supreme court has recently held that, because the district court may not invade the province of the jury, a district court erred by amending a judgment to "itemize" a jury's single special verdict into different categories of damages. *Poppler v. Wright Hennepin Coop Elec. Ass'n*, 845 N.W.2d 168, 173–74 (Minn. 2014). But here, the district court properly addressed whether the damages found in each special verdict, as enumerated separately by the jury, could be sustained under any reasonable theory of the evidence. *See Evanson v. Jerowski*, 308 Minn. 113, 116 n.2, 241 N.W.2d 636, 639 n.2 (1976) (stating that "[a district] court has the same authority to set aside . . . a special verdict when not supported by the evidence as it has to grant [JMOL]").

**Affirmed in part, reversed in part, and remanded.**