Katryna L. DAMGAARD, Plaintiff,

v.

AVERA HEALTH, et al., Defendants.

Civ. No. 13–2192 (RHK/JSM).

United States District Court, D. Minnesota.

Signed June 3, 2015.

## MEMORANDUM OPINION AND ORDER

RICHARD H. KYLE, District Judge.

### INTRODUCTION

This medical-malpractice action arises out of the birth of Plaintiff Katryna Damgaard's daughter, I.L.D., on May 20, 2010. Damgaard alleges the physician handling her labor and delivery, Defendant Mary Olson, M.D., provided negligent care to her and I.L.D. in several respects, resulting in a bevy of health problems for I.L.D. She commenced this action in August 2013 against two entities, Avera Health and Avera McKennan, which she alleged employed Dr. Olson and are therefore legally responsible for the alleged negligence. Defendants now move for summary judgment on certain of Damgaard's claims. For the reasons that follow, the Motion will be granted.

### BACKGROUND

The record reveals the following facts, which are taken in the light most favorable to Damgaard:

*The parties*

Damgaard resides in Windom, Minnesota, a rural city approximately 100 miles east of Sioux Falls, South Dakota. She became pregnant with I.L.D. in August or September of 2009 and received care during her pregnancy from Dr. Olson at Avera Medical Group Windom.

Avera Medical Group is the name under which Avera Health does business in Minnesota.[1] It is a South Dakota corporation and health-care conglomerate that is the sole member of Avera McKennan,

Patrick Andrew Thronson, Stephen C. Offutt, Robert S. Lewis, Janet, Jenner & Suggs, LLC, Baltimore, MD, for Plaintiff.

Mark R. Bradford, Cecilie M. Loidolt, Jessica L. Klander, Kelly A. Putney, Sarah M. Hoffman, Christine E. Hinrichs, Bassford Remele PA, Minneapolis, MN, for Defendants.

1. One of Defendants' witnesses, David Flicek, avers that Avera Medical Group is a d/b/a of Avera *McKennan,* not Avera *Health.* (Flicek Aff. (Doc. No. 46) ¶ 1.) But records from the Minnesota Secretary of State indicate the entity holding the trademark "Avera Medical Group" is Avera *Health.* (Thronson Aff. (Doc. No. 99) Ex. D.) Further, Avera Medical Group Windom's website states that it is "part of Avera Health." (*Id.*)

another South Dakota-based health-care conglomerate. Each provides health-care related services, including ownership ' of hospitals, nursing homes, and similar facilities, as well as consulting, management and related services to health-care providers affiliated with Avera McKennan or Avera Health.

Dr. Olson is a family-practice doctor employed under a contract with Avera McKennan; she sees patients at Avera Medical Group Windom and has privileges to practice at Windom Area Hospital, where I.L.D. was born. The hospital is owned by the City of Windom and managed by another entity known as Sanford Health. Neither the hospital, the City of Windom, nor Sanford Health has been named a Defendant in this action.

*The delivery*

On May 17, 2010, Damgaard saw Dr. Olson at Avera Medical Group Windom, when she was approximately 38 weeks pregnant. She was having contractions and exhibiting signs of preeclampsia, a pregnancy-related complication involving high blood pressure. As a result, Dr. Olson referred her to Windom Area Hospital for the administration of Pitocin, a drug used to induce labor. Pitocin was administered at 1:23 pm but ultimately failed to result in I.L.D.'s delivery. Dr. Olson sent Damgaard home at approximately 8:30 pm, while she was still experiencing contractions, with instructions to return to the hospital if contractions increased, but in no event later than 7:00 pm on May 19.

Damgaard returned to the hospital on May 19 at approximately 2:00 pm, advising that she was having contractions every two minutes. She was admitted and placed on a fetal heart monitor. Dr. Olson visited with her at approximately 3:20 pm and again at approximately 8:30 pm; in the interim, she was monitored by several different nurses. At 8:30 pm Dr. Olson intentionally ruptured Damgaard's membranes, *i.e.*, broke her water, which revealed meconium-stained fluid.[2] Progress notes indicate the baby continued to experience changes in heart rate (a good thing), with accelerations and "variable decelerations," but at this point Damgaard's cervix was only four centimeters dilated. At 10:15 pm Dr. Olson noted Damgaard's cervix was five centimeters dilated, and at approximately 11:30 pm it had progressed to six centimeters. At that point, after reviewing the fetal monitoring "strips," Dr. Olson left the hospital.

Approximately 40 minutes later, nurses contacted Dr. Olson after noticing a prolonged deceleration in the baby's heart rate. At 12:40 am on May 20, Dr. Olson ordered a Caesarian section (C-section), and the hospital's surgery personnel were notified. Dr. Olson arrived at the hospital shortly thereafter, and Damgaard was transferred to the operating room at 1:17 am. I.L.D. was delivered via C-section at 1:36 am. She was noted as being limp and pale and having shiny, edematous skin; she made no effort to cry and was eventually intubated and suctioned to remove meconium from her lungs. She began to experience symptoms consistent with seizures and, after consulting with another doctor at Avera McKennan Hospital in Sioux Falls, Dr. Olson administered phenobarbital, an anti-seizure medication. She was later transferred via helicopter to Avera McKennan Hospital, where she was diagnosed as having suffered from hypoxic-ischemic encephalopathy (HIE), or inadequate oxygenation to brain tissue.

Now five years old, I.L.D. suffers from spastic quadriplegic cerebral palsy, seizures, and developmental delay allegedly resulting from the HIE and is unable to feed herself, walk, or control her bowels or

2. Meconium is fetal stool.

bladder. Damgaard attributes these maladies to Dr. Olson's negligence, for which she seeks to hold Avera McKennan and Avera Health responsible.

Damgaard commenced this action on August 13, 2013. Her two-Count Amended Complaint alleges (1) on behalf of I.L.D., medical negligence on the part of "Avera Health and/or Avera McKennan, individually and/or by and through their employees, ... including but not limited to Mary L. Olson, M.D." and (2) on her own behalf, loss of consortium with I.L.D. as a result of Defendants' alleged negligence.[3] (Am. Compl. ¶¶ 26–34.) With respect to Count I, she alleges Dr. Olson failed to properly assess and treat her and oversee her care in numerous ways and that "Avera Health and/or Avera McKennan" was/were negligent by failing to adequately instruct, train, or supervise its employees and by failing to establish, follow, or enforce policies and protocols relevant to the delivery of children. (Id. ¶ 29(a)-(z).) She seeks an award of past medical expenses in excess of $400,000, future medical expenses in excess of $10 million, and lost future earning capacity in excess of $1 million. (Id. ¶ 3.)

Defendants now move for summary judgment on certain of Damgaard's claims, as discussed in more detail below. The Motion has been fully briefed, the Court heard oral argument on May 20, 2015, and the Motion is ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Ricci v. DeS-*

*tefano,* 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir.2011) (*en banc*); *Whisenhunt v. Sw. Bell Tel.,* 573 F.3d 565, 568 (8th Cir.2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. *Beard v. Banks,* 548 U.S. 521, 529–30, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006); *Weitz Co., LLC v. Lloyd's of London,* 574 F.3d 885, 892 (8th Cir.2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed.R.Civ.P. 56(c)(1)(A); *Wood v. SatCom Mktg., LLC,* 705 F.3d 823, 828 (8th Cir.2013).

## ANALYSIS

### I. Corporate negligence

■ As noted above, a portion of Count I asserts Defendants are *directly* liable to Damgaard, rather than *vicariously* liable for Dr. Olson's alleged negligence, because they failed to adequately instruct, train, or supervise employees and failed to establish, follow, or enforce policies and protocols relevant to the delivery of babies, such as the failure to develop policies regarding the administration of Pitocin. (Am. Compl. ¶ 29(c)-(g).) Defendants argue these claims—for "direct corporate negligence"—are not cognizable under Minnesota law.[4] The Court agrees.

Defendants' argument springs from the Minnesota Supreme Court's decision in

---

3. Damgaard has moved to voluntarily dismiss her individual claim (Count II), and that Motion was heard by Magistrate Judge Mayeron on May 27, 2015.

4. As this is a diversity case, the Court applies Minnesota substantive law, and all parties agree it is applicable here.

*Larson v. Wasemiller*, 738 N.W.2d 300 (Minn.2007). There, the plaintiff alleged her treating physician had negligently performed gastric-bypass surgery. But she also alleged the *hospital* at which the surgery was performed was negligent "in granting surgery privileges to" the doctor. *Id.* at 302. The hospital moved to dismiss this claim, arguing Minnesota does not recognize a claim for "negligent credentialing"—that is, a hospital's negligence in granting privileges to a physician—but the district court denied the motion. The Minnesota Court of Appeals reversed, concluding a cause of action for negligent credentialing does not exist under Minnesota law. The Supreme Court agreed with the district court and reversed the Court of Appeals. After canvassing similar cases in other states, the Supreme Court ruled the tort of negligent credentialing was "inherent in" the common law and, as such, was recognized in Minnesota. *Id.* at 306.

For present purposes, the key portion of the Supreme Court's opinion was footnote 4. There, *Larson* noted a distinction between negligent credentialing and the "broader" concept of "corporate negligence," that is, claims involving "direct hospital negligence, such as negligence in supervising patient care or in failing to enforce hospital guidelines regarding patient care." Importantly, the court did not speak to such "broader" claims, instead recognizing only the narrower tort of negligent credentialing. *Id.*

Six years later, the Minnesota Court of Appeals applied *Larson* to conclude that "direct corporate medical negligence" is not cognizable in Minnesota. In *Bothun v. Martin LM, LLC*, No. A12–1377, 2013 WL 1943019 (Minn.Ct.App. May 13, 2013), the plaintiff's wife died at a rehabilitative-care center following surgery. In addition to suing the surgeon, the plaintiff sued the care center, asserting it was *directly* negligent, although the exact basis for the

plaintiff's claims is unclear. Regardless, the care center moved to dismiss the claims and the district court granted the motion, concluding "Minnesota law does not recognize such a cause of action." *Id.* at *1, *5. The Court of Appeals affirmed based upon *Larson:*

> Both parties rely on the Minnesota Supreme Court decision in *Larson v. Wasemiller* for their arguments regarding whether direct corporate negligence is a cause of action in Minnesota. In *Larson,* the supreme court recognized the tort of "negligent credentialing." Before deciding to recognize negligent credentialing as a tortious offense, the supreme court conducted a thorough review of neighboring jurisdictions before noting that, "[s]ome courts have recognized the tort of negligent credentialing as simply the application of broad common law principles of negligence." However, the supreme court adopted the tort of negligent credentialing without tying its rationale to these "broad[er] common law principles." Instead, the supreme court explicitly narrowed its opinion to the specific theory of negligent credentialing. [citing *Larson's* footnote 4] We conclude that there is no support for Bothun's assertion that *Larson* implicitly recognizes a claim for direct corporate negligence.

> Bothun also contends that direct corporate negligence is an extension of ordinary and professional negligence and thus already recognized under Minnesota law. We disagree. It is clear that claims of negligent credentialing and direct corporate negligence are distinct from ordinary and professional negligence. If the cause of action was a simple offshoot of ordinary and professional negligence, the supreme court's recognition of negligent credentialing would have been duplicative.

The court of appeals is an error-correcting court without the authority to change the law or create new causes of action. Even if Bothun is correct that the supreme court is likely to extend *Larson* to recognize claims of direct corporate negligence on public policy grounds, it would be improper for us to overreach and establish a new tort. The district court did not err when it dismissed these counts of Bothun's complaint.

*Id.* at *5 (citations omitted). *Bothun,* therefore, appears to scuttle Damgaard's direct negligence claims against Avera McKennan and Avera Health.

Damgaard attempts to distinguish *Bothun* by arguing the case "does not expressly hold that there is no claim in Minnesota for direct corporate negligence." (Mem. in Opp'n at 6.) But it is nigh impossible to interpret the decision any other way. Indeed, *Bothun* read *Larson* to preclude any direct corporate negligence claim broader than one for negligent credentialing, at least in the healthcare context, and that interpretation of *Larson* is eminently supportable. If direct corporate negligence against a healthcare provider were in fact a viable claim, as Damgaard contends, there would have been no need for *Larson* to expressly recognize the existence of the *narrower* tort of negligent credentialing. *See Bothun,* 2013 WL 1943019, at *5 ("If the cause of action was

a simple offshoot of ordinary and professional negligence, the supreme court's recognition of negligent credentialing would have been duplicative."). This is precisely why *Bothun* concluded "there is no support ... that *Larson* implicitly recognizes a claim for direct corporate negligence." *Id.*[5]

At oral argument Damgaard's counsel appeared to recognize most of her direct corporate negligence claims were untenable. Indeed, despite asserting direct negligence in several different ways in the Amended Complaint (*see* Am. Compl. ¶ 29(c)-(g)), at the hearing counsel's argument was limited to negligent supervision—that is, the allegation Defendants "failed to adequately instruct, train, and/or supervise [their] agents, servants, and/or employees, including but not limited to Dr. Mary Olson" (*id.* ¶ 29(c)). (*See* 5/20/15 Hr'g Tr. at 20–21.) But this claim, too, cannot survive.

■ To be sure, Minnesota courts (including the Minnesota Supreme Court) have recognized the tort of negligent supervision. *See, e.g., Semrad v. Edina Realty, Inc.,* 493 N.W.2d 528, 533–34 (Minn. 1992); *Yunker v. Honeywell, Inc.,* 496 N.W.2d 419, 422 (Minn.Ct.App.1993). But negligent supervision derives from *respondeat superior* and, hence, is predicated on *vicarious* rather than *direct* liability, even though the claim is asserted directly

**5.** Damgaard points to Minnesota's Civil Jury Instruction Guide, in particular § 80.37, entitled "Duty of Hospital," to support her claims. Section 80.37 recites the elements of a claim against a hospital predicated upon the "reasonable care for the protection and wellbeing of its patients." But while she correctly notes that a "hospital must use reasonable care in serving a patient" (*id.*), she overlooks that (1) neither Avera McKennan nor Avera Health is a hospital and (2) I.L.D. was delivered at Windom Area Hospital, which is neither owned nor managed by Defendants. (True, Damgaard received some treatment at

an Avera Health facility on May 17, 2010, specifically Avera Medical Group Windom, but she points to no cases applying or even referencing § 80.37 in the context of a non-hospital medical facility and, as discussed more below, she points to no injuries she or I.L.D. suffered from the events of May 17.) Nor has she cited any decision in which a court used the Jury Instruction Guide to support a claim against a healthcare provider for failing to implement or enforce policies or procedures, as alleged here. In the Court's view, therefore, the Jury Instruction Guide does not aid her cause.

against the employer. *See, e.g., Yunker*, 496 N.W.2d at 422. For this reason, such a claim requires showing a defendant failed to "prevent the foreseeable misconduct of an employee from causing harm to ... third persons." *Hudson v. City of Minneapolis*, Civ. No. 04–3313, 2006 WL 752935, at *9 (D.Minn. Mar. 23, 2006) (Ericksen, J.). Yet here, Damgaard points to no evidence suggesting Dr. Olson's alleged negligence was or should have been foreseeable to Defendants. True, as counsel noted at the hearing, policies existed that arguably required Dr. Olson to consult with an obstetrician during Damgaard's labor and delivery. But there is no evidence before the Court suggesting that Defendants were or should have been aware Dr. Olson might deviate from those policies. On this record, therefore, the negligent-supervision claim fails. *Cf. Halsne v. Avera Health*, Civ. No. 12–2409, 2014 WL 1153504, at *7 (D.Minn. Mar. 21, 2014) (Nelson, J.) (genuine issue of material fact regarding negligent supervision of doctor who allegedly administered incorrect medicine to plaintiff, where evidence showed doctor had history of improperly prescribing medication and had license to practice medicine restricted as a result).

For all of these reasons, and based upon *Larson* and *Bothun,* the Court concludes the direct corporate negligence claims against Avera McKennan and Avera Health fail. *See also Halsne,* 2014 WL 1153504, at *5 (dismissing direct negligence claims predicated on similar allegations in a case with nearly identical facts to those here). As a result, the Court need not reach Defendants' alternative argument that Damgaard has failed to link their alleged negligence with her injuries.[6]

## II. Vicarious liability of Avera Health

Defendants acknowledge that Avera McKennan, Dr. Olson's employer, may be held vicariously liable if Damgaard successfully establishes Dr. Olson was negligent. They argue, however, that only Avera *McKennan,* and not Avera *Health,* may be held vicariously liable because only the former employed Dr. Olson. The Court agrees.

As Defendants correctly note, and Damgaard appears to concede, in Minnesota a healthcare provider can be vicariously liable for a physician's negligence only if the physician is an employee of the provider. *See, e.g., Halsne,* 2014 WL 1153504, at *7; *Kramer v. St. Cloud Hosp.,* No. A11–1187, 2012 WL 360415, at *8–9 (Minn.Ct. App. Feb. 6, 2012); *McElwain v. Van Beek,* 447 N.W.2d 442, 446 (Minn.Ct.App. 1989). Here, Dr. Olson's employment contract is clear and unambiguous and demonstrates that she was employed by Avera McKennan. (Hoffman Aff. Ex. A.) While the agreement alone is not dispositive, *see, e.g., Ossenfort v. Associated Milk Producers, Inc.,* 254 N.W.2d 672, 677 (Minn.1977), it is powerful evidence suggesting Avera McKennan was Dr. Olson's employer.

Damgaard responds that the record creates a genuine issue whether Dr. Olson was an employee of Avera Health *in addi-*

---

6. The Court notes that Damgaard relies upon the report of her expert, James Albright, to support her claims; Albright opines Defendants violated various Medicare and Medicaid regulations. In light of the Court's conclusion that direct corporate negligence against a healthcare provider is not cognizable in Minnesota, it need not consider Albright's opinions. Regardless, the Court agrees with Defendants that the referenced federal regulations create no private right of action, *see, e.g., Neiberger v. Hawkins,* 208 F.R.D. 301, 310 (D.Colo.2002), and permitting Damgaard to rely upon them here would "make an end run around this rule by recasting violations of the [regulations] as" negligence. *In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.,* 592 F.Supp.2d 1147, 1161 (D.Minn. 2009) (Kyle, J.), *aff'd,* 623 F.3d 1200 (8th Cir.2010).

*tion to* Avera McKennan. (Mem. in Opp'n at 9–12.) She cites several facts allegedly supporting that conclusion, namely, (1) an Avera Health employee, Frederick Slunecka, signed Dr. Olson's employment agreement, (2) another Avera Health employee, David Flicek, is Dr. Olson's "main contact" and could fire her if she violated her employment agreement, (3) Flicek set the amount of incentive compensation Dr. Olson could earn under the employment agreement, (4) Avera Health's website lists Dr. Olson as "part of" Avera Medical Group Windom, a name under which Avera Health does business, and (5) an entity known as Avera Credentialing Verification Services (ACVS), which is part of Avera Health, "holds and manages Dr. Olson's credentialing file." (*Id.* at 11.)[7] In the Court's view, these facts do not suffice.

▮▮▮▮ The strongest evidence cited by Damgaard is that Flicek, arguably an Avera Health employee (although he denies it), enjoys the authority to (i) terminate Dr. Olson's employment were she to breach her employment agreement and (ii) calculate the incentive compensation to which she is entitled under the agreement. But the Court does not believe these facts create a genuine issue whether Avera Health employed Dr. Olson. To be sure, the right to discharge is an important factor suggesting the existence of an employment relationship. *See, e.g., St. Croix Sensory Inc. v. Dep't of Employment & Economic Dev.,* 785 N.W.2d 796, 800 (Minn.Ct.App.2010); *Hix v. Minn. Workers' Comp. Assigned Risk Plan,* 520 N.W.2d 497, 501 (Minn.Ct.App.1994). Yet, it is not dispositive. *See, e.g., Hix,* 520

N.W.2d at 501; *see also Opera v. Dep't of Emp't & Econ. Dev.,* No. A13–2343, 2014 WL 4672360, at *3 (Minn.Ct.App. Sept. 22, 2014) ("In employment-status cases, there is no general rule that covers all situations."). Another factor, often cited as the "most important" factor, is "the right of the purported employer to control the means and manner of [the alleged employee's] performance." *Hix,* 520 N.W.2d at 501 (citing *Newland v. Overland Express, Inc.,* 295 N.W.2d 615, 618 (Minn.1980)); *accord, e.g., St. Croix Sensory,* 785 N.W.2d at 800 ("The right of control is the most important factor for determining whether a worker is an employee."). Indeed, as defense counsel noted at oral argument, it is control over the manner and means of an employee's performance that gives rise to vicarious liability in the first place. *See Urban ex rel. Urban v. Am. Legion Post 184,* 695 N.W.2d 153, 160 (Minn.Ct.App. 2005) ("The right to control . . . gives rise to the vicarious liability of a principal or master for the tortious act of his or her agent.").

▮▮▮▮ Here, however, Damgaard cites no evidence in the record indicating Avera Health had any control over the means and manner of Dr. Olson's performance. Nor is there any suggestion that Avera Health actually *paid* Dr. Olson, despite Flicek's authority to determine the amount of her incentive compensation. *See Hix,* 520 N.W.2d at 501. Moreover, although Flicek testified in his deposition that he had the authority to discharge Dr. Olson, there is no suggestion *only* Flicek enjoyed that authority. And, his ability to fire Dr.

---

**7.** Damgaard also points to Albright's report, in which he opines that Avera Health employs Dr. Olson. But it is "not the province of an expert witness to offer opinions on domestic law, or to proffer legal conclusions." *Keller v. City of Fremont,* Nos. 8:10CV270, 4:10CV3140, 2012 WL 27460, at *1 & n. 2 (D.Neb. Jan. 4, 2012) (collecting cases). Fur-

ther, at oral argument she contended there exists "record testimony from a senior executive at Avera Health that [Dr.] Olson was hired by him." (5/20/15 Hr'g Tr. at 16.) But she cited no specific evidence for that contention, nor did she point to any evidence to support it in her brief.

Olson was limited to situations in which she materially breached her employment agreement—an agreement indisputably between her and Avera *McKennan*. In the Court's view, therefore, these facts do not create a genuine issue as to the existence of an employment relationship between Avera Health and Dr. Olson.

The remaining facts cited by Damgaard are equally unavailing. For example, it is undisputed Slunecka was an employee of *both* Avera McKennan and Avera Health, but signed Dr. Olson's employment agreement only in his capacity as the President and CEO of Avera McKennan. (Hoffman Aff. Ex. A at 7.) The reference to Dr. Olson on Avera Health's website is unsurprising, given that Avera Health is Avera McKennan's lone member; it does not establish, in the Court's view, that she was an employee of Avera Health. The same is true of the fact that ACVS holds Dr. Olson's credentialing file and that Flicek is Dr. Olson's "contact" (which Damgaard does not explain).[8] At most, Damgaard shows an interrelationship between Avera McKennan and Avera Health, but that interrelationship cannot suffice. Were it otherwise, parent corporations would be responsible for the acts of a subsidiary's employees and sister corporations could be held responsible for one another's negligence. A plaintiff must show more. *See Halsne*, 2014 WL 1153504, at *7–8 (rejecting vicarious liability claims against Avera *Health* for alleged negligence of physician employed under contract with Avera *McKennan* based upon theories of agency, alter ego, and common "purpose and existence"). Indeed, by Damgaard's logic a hospital granting privileges to a physician, and thereby creating a relationship between the two, could be deemed to employ the physician, but the Minnesota Supreme Court has made clear the "granting of hospital privileges normally does not create an employment relationship with the hospital." *Larson*, 738 N.W.2d at 302. So too here.

For these reasons, the Court concludes the vicarious liability claims against Avera Health must be dismissed.

### III. Avera McKennan's vicarious liability

While conceding it may be held vicariously liable for Dr. Olson's (alleged) negligence, Avera McKennan nevertheless argues that certain of Damgaard's vicarious-liability claims must be dismissed. The Court discusses each of its arguments in turn.

### A. The Minnesota peer review statute

■ Avera McKennan first argues that Damgaard may not rely upon its own policies or those promulgated by Windom Area Hospital or another hospital Avera McKennan owns, Avera McKennan Hospital in Sioux Falls, South Dakota, to establish her negligence claims. The Court agrees.

■ At the outset, it appears Damgaard recognizes she cannot establish negligence simply by showing Dr. Olson failed to follow policies or regulations established by Avera McKennan or Windom Area Hospital. In Minnesota, a plaintiff seeking to establish medical negligence must do so through the use of expert testimony regarding the appropriate standard of care. *See, e.g., Swanson v. Chatterton*, 281 Minn. 129, 160 N.W.2d 662, 666 (1968); *Nowak v. City of Hutchinson*, No. CX–95–1323, 1995 WL 672877, at *2 (Minn.Ct.App. Nov. 14,

---

8. The Court also notes Dr. Olson saw patients, including Damgaard, at an Avera Health facility—namely, Avera Medical Group Windom— but Damgaard does not point to this fact in an attempt to establish an employment relationship.

1995) (noting Minnesota law "requires that a plaintiff in a medical malpractice action submit an [expert] affidavit detailing ... the standard of care, the acts allegedly violating that standard, and an outline of the chain of causation"). Hence, it is not enough for a plaintiff simply to point to a healthcare provider's policies and claim they were breached. This conclusion, of course, flows from the fact a plaintiff asserting medical negligence must establish a physician breached the standard of care *in the relevant medical community*—not just at her hospital. *E.g., Dickhoff ex rel. Dickhoff v. Green*, 836 N.W.2d 321, 329 (Minn.2013).

Nevertheless, Damgaard contends she may elicit evidence at trial regarding the challenged policies because they "inform" or are the "building blocks" for the relevant standard of care. (Mem. in Opp'n at 13–14.) Putting aside that this argument is more in the nature of a motion in limine, it falters because it runs headlong into Minnesota's "peer review" statute, Minn. Stat. § 145.65.

The peer-review statute provides that "[n]o guideline established by a review organization shall be admissible in evidence in any proceeding brought by or against a professional by a person to whom such professional has rendered professional ser-

vices." The statute is designed to " 'serve the strong public interest in improving the quality of health care' by protecting guidelines developed by certain health care review organizations." *DeYoe v. N. Mem'l Health Care*, No. C7–99–1837, 2000 WL 1051964, at *4 (Minn.Ct.App. Aug. 1, 2000) (quoting *Kalish v. Mount Sinai Hosp.*, 270 N.W.2d 783, 785 (Minn.1978)). It was enacted in the "belief ... that health care will be fostered if review committees can carry on discussions without the threat of malpractice and defamation actions," and hence it "encourages the medical profession to police its own activities with minimum judicial interference." *Id.*[9]

Damgaard simply cannot avoid application of the peer-review statute here. Indeed, she mounts no real challenge to Defendants' evidence that the policies in question were enacted by committees meeting the relevant criteria for the statute's application.[10] Instead, she relies upon Magistrate Judge Mayeron's June 9, 2014 Order (Doc. No. 69) granting Damgaard's Motion to Compel and requiring the production of the challenged policies. But Judge Mayeron opined only that the policies were *discoverable*, and discoverability and admissibility, of course, are entirely separate issues, with the former far broader than the latter.[11] In the under-

9. As this is a diversity case, the peer-review statute may be applied under Federal Rule of Evidence 501.

10. In order to fall within the peer-review statute, a policy must have been enacted by a committee comprising professionals or administrative staff of a hospital or other healthcare provider established to "gather and review information relating to the care and treatment of patients for the purposes of ... developing and proposing guidelines designed to improve the safety of care provided to individuals." Minn.Stat. § 145.61, subd. 5. Defendants' evidence shows that to be true here with respect to all of the policies Damgaard cites.

11. Moreover, in the course of briefing the Motion to Compel, Defendants *abandoned* their argument the policies were not discoverable. (*See* Doc. No. 69 at 9.) That was a wise decision, as the Minnesota Supreme Court held in *Kalish* that such policies may be explored in discovery notwithstanding the protection of the peer-review statute. 270 N.W.2d at 786. And while Damgaard has submitted the transcript from a hearing in a case pending before the Ramsey County District Court, *Patnode v. Children's Health Care et al.*, the transcript reveals the issue there also was one of discoverability rather than admissibility.

signed's view, the peer-review statute makes clear the policies in question may not be inquired into at trial. *See also, e.g., DeYoe,* 2000 WL 1051964, at *4 (no error in precluding plaintiff from offering at trial hospital's policies regarding use of Pitocin during labor); *but see Trebnick v. Deer River Healthcare Ctr., Inc.,* No. 31–CV–12350, 2013 WL 6223592, at *3 (Minn.Dist. Ct. Aug. 19, 2013).

### B. Windom Area Hospital nurses

 In her Amended Complaint, Damgaard alleges, among other things, that Dr. Olson was negligent by failing to "provide appropriate trained and skilled medical personnel to care for Plaintiff Damgaard when she [Dr. Olson] was not present." (Am. Compl. ¶ 29(*o* ).) Defendants seek dismissal of the claim alleged in paragraph 29(*o* ), arguing none of the allegedly negligent "medical personnel"—whom the parties seem to agree comprise nurses attending to Damgaard while at Windom Area Hospital (*see* 5/20/15 Hr'g Tr. at 21–22)—was employed by Dr. Olson. Damgaard does not dispute that contention but responds that she may establish liability for this claim under the "borrowed servant" doctrine. The Court disagrees.

The Minnesota Supreme Court first recognized the borrowed-servant doctrine (also called the loaned-servant doctrine) in *Swigerd v. City of Ortonville,* 246 Minn. 339, 75 N.W.2d 217 (1956). There, the high court recognized that a hospital is liable to its patients for negligent care rendered by its employees under the doctrine of *respondeat superior,* but different rules apply when a hospital "assigns one of its nurses (who is in its general employ) to perform a duty for a surgeon or physician in operating upon or in actually treating a patient, and with respect to the performance of such designated duty surrenders direction and control over the nurse to such surgeon or physician." *Id.* at 220.

In such a situation, the nurse "becomes the servant" of the doctor "insofar as her services relate to the controlled work," and as a result the hospital "ceases to be liable *for the negligence of the nurse.*" *Id.* (emphasis added).

At first blush, it would appear the borrowed-servant doctrine might be applicable here, as Dr. Olson allegedly oversaw all of Damgaard's care at Windom Area Hospital. But the highlighted language above leads the Court to conclude otherwise. The tenor of Damgaard's opposition is that Dr. Olson is liable "for any negligence by the Windom Area Hospital nursing staff" (Mem. in Opp'n at 16), and indeed the borrowed-servant doctrine could support such a claim—in essence it is a specialized type of vicarious liability, shifting responsibility for a nurse's conduct from hospital to doctor. But the doctrine simply cannot apply here because the Amended Complaint *does not allege any negligence on the part of the nurses.* Indeed, although Damgaard's experts now opine the nurses rendered substandard care in several ways, the Amended Complaint says *nothing at all* about negligence by the nurses, despite its incredible level of medical detail. To the extent Damgaard predicates her claim on such allegations to support vicarious liability against Dr. Olson, the claim must be dismissed.

 Damgaard contends that she also alleges in the Amended Complaint that Dr. Olson was *directly* negligent by failing to properly "advise and supervise the hospital nurses regarding their care and treatment." (Mem. in Opp'n at 19.) But yet again, there is no allegation in her pleading that Dr. Olson failed to appropriately *supervise* nurses at Windom Area Hospital. She cannot expand her claims now in response to summary judgment. That being said, Damgaard *did* allege in the Amended Complaint that Dr. Olson "failed

to properly advise the nursing staff of [Damgaard's] concerning fetal heart rate tracing and status," although this allegation is found in paragraph 29(m) and not paragraph 29(o). As such a claim does not implicate the borrowed-servant doctrine, it may proceed.

## C. The events of May 17, 2010

■ Finally, Defendants argue any claim arising out of Dr. Olson's conduct on May 17, 2010—namely, discharging Damgaard from the hospital before delivery was completed—must be dismissed because Damgaard's experts fail to opine that such conduct caused I.L.D.'s injuries. (Def. Mem. at 15.) They argue none of the experts "time the injury as having occurred ... at any ... time before Damgaard returned to the hospital on May 19" and "all believe that the injur[ies] occurred on the 'day of birth' or more specifically, just prior to delivery, within the last 30–60 minutes." (*Id.* at 16.)

■ Damgaard responds that her experts "have detailed a number of mistakes, occurring on May 17, 19, 20 and the role they played in causing [I.L.D.'s] brain injury." (Mem. in Opp'n at 23.) But in support, she cites nothing more specific than the expert reports *in their entirety*, some of which are dozens of pages long. This will not suffice. A party opposing summary judgment must set forth "*specific* facts by affidavits or otherwise showing that there is a genuine issue for trial." *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 565–66 (8th Cir.2000) (emphasis added); *accord, e.g.,* Fed. R.Civ.P. 56(c)(1)(A) (party asserting a fact is genuinely disputed "must support the assertion by citing to *particular parts* of materials in the record") (emphasis added); *Barge v. Anheuser–Busch, Inc.,* 87 F.3d 256, 260 (8th Cir.1996) ("A district court is not required to speculate on which portion of the record the nonmoving party

relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."). Simply put, it is not this Court's responsibility "to sift through" the expert reports "to see if, perhaps, there [is] an issue of fact." *Satcher v. Univ. of Ark. at Pine Bluff,* 558 F.3d 731, 735 (8th Cir.2009).

■ More importantly, though, the Court agrees with Defendants that Damgaard is attempting to establish causation in a "but-for" way rather than through proximate causation with respect to the events of May 17. To establish negligence in Minnesota, a plaintiff must show the defendant's conduct *proximately* caused her injury, that is, was a substantial factor in bringing about the injury. *George v. Estate of Baker,* 724 N.W.2d 1, 10 (Minn. 2006). As the Minnesota Supreme Court noted in *George,* "[f]actual, or but-for, causation is insufficient to establish liability in Minnesota because in a philosophical sense, the causes of an accident go back to the birth of the parties and the discovery of America." *Id.* at 11.

Here, Damgaard offers a classic case of but-for causation with respect to the events of May 17. She alleges in the Complaint and in her Motion papers that Dr. Olson should have carried through with labor and delivery on that date (*see* Am. Compl. ¶ 29(r); Mem. in Opp'n at 21–22), which purportedly would have prevented her from being "exposed to [the] *further* acts of negligence by Dr. Olson on May 19 that suffocated [I.L.D.] in utero." (Mem. in Opp'n at 22 (emphasis added).) But she acknowledges she possesses no evidence of any injuries to I.L.D. occurring on May 17 (*see id.* (agreeing this was "before the window of injury identified by Plaintiffs' causation experts")), or at any other time before she returned to the hospital on May 19, and, hence, she only attempts to link the events of May 17 to

I.L.D.'s maladies using an attenuated "chain-of-events" logic. (*See id.* at 23 ("Defendants had numerous opportunities to change course and timely deliver I.L.D., rather than continuing a course of conduct that resulted in her devastating injuries.").) Accordingly, she has failed to show the events of May 17 presented anything more than the "occasion [for] the injur[ies]" I.L.D. sustained several days later. *Kryzer v. Champlin Am. Legion No. 600,* 494 N.W.2d 35, 37 (Minn.1992). This will not do.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Partial Summary Judgment (Doc. No. 89) is **GRANTED** and the following claims are **DISMISSED WITH PREJUDICE:**

1. All claims of direct corporate negligence against Defendants (Am. Compl. ¶¶ 29(c)-(g));
2. All claims of vicarious liability against Avera Health—as this disposes of all remaining claims against Avera Health, it is dismissed as a Defendant;
3. All claims of vicarious liability against Avera McKennan predicated on its failure to follow policies or procedures covered by Minnesota's peer-review statute, Minn.Stat. § 145.65;
4. All claims alleging Dr. Olson was negligent by failing to "provide appropriate trained and skilled medical personnel to care for Plaintiff Damgaard when [Dr. Olson] was not present" (Am. Compl. ¶ 29(*o* )); and
5. All claims predicated on the events of May 17, 2010 (*id.* ¶ 29(r)).